IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

In the matter of the Arbitration between §
EXCEED INT'L LIMITED, §
§
    Applicant/Counter-Defendant, §
§
v. §        CIVIL ACTION NO. H-13-2572
§
DSL CORPORATION, §
§
    Respondent/Counter-Plaintiff, §
§
v. §
§
LIDA PIPE (VIETNAM) CO. LTD., §
§
    Third Party Defendant. §

## <u>MEMORANDUM AND ORDER</u>

Exceed International Limited ("Exceed") initiated this proceeding to confirm an arbitration award against DSL Corporation ("DSL").[1]  Although Exceed did not commence this proceeding with an original complaint, DSL filed  an "Answer" and asserted counterclaims against Exceed.[2]  DSL also named Tianjin Lida Steel Pipe Group Co, Ltd. ("Lida Pipe") as a Third Party Defendant.  Exceed and Lida Pipe each

---

[1]    *See* Application to Confirm Arbitration Award [Doc. #1].

[2]    DSL Corporation's Amended Answer to Exceed Int'l's Application to Confirm Arbitration Award and Counterclaim and Third Party Complaint [Doc. # 9].

have filed motions to dismiss DSL's counterclaims and third-party complaint.[3]
Finally, DSL has filed a Motion to Stay Arbitration Confirmation Pending Discovery,
to which numerous supplements and responses were filed.[4]

The motions are ripe for decision.  Having considered the parties' submissions,
all matters of record, and applicable legal authorities, the Court **denies** Exceed's
application to confirm the award, **dismisses without prejudice** the counterclaims
brought by DSL, and **denies as moot** DSL's request for a stay pending discovery.

# I.   BACKGROUND

Exceed is organized under the laws of New Zealand and has its principal place
of business in Auckland, New Zealand.  Exceed shares common ownership with Lida
Pipe, a Chinese company.  DSL is incorporated under the laws of Texas, with its
principal place of business in Houston.

Exceed sells steel pipes and casing manufactured by Lida Pipe.  Lida Pipe and
DSL entered into eighteen sales contracts between July 2011 and October 2012.
These contracts were signed on DSL's behalf by Sang S. Lee, DSL's President.  Lee
also signed several secondary contracts with Exceed, which provided for payment by

---

[3]   Exceed's Motion to Dismiss DSL Corporation's Counterclaims [Doc. # 15]; Lida
Pipe's Motion to Dismiss DSL's Third Party Complaint [Doc. # 17].  DSL responded
to these motions, *see* Docs. # 18, # 24, and Exceed and Lida Pipe replied.  *See* Docs.
# 22, # 27.

[4]   *See* Docs. # 16, 20, # 21, # 25, # 28, # 34.

DSL to Exceed for pipe manufactured by Lida Pipe.[5]  Four of these latter contracts between Exceed and DSL are at issue in this action (the "Secondary Contracts"), two of which were executed in January 2012, and two in March 2012.[6]  All four Secondary Contracts were written in both Chinese and English; each English paragraph was followed by a corresponding Chinese paragraph.

The Lee Declaration submitted by DSL describes the negotiation and formation of the Secondary Contracts.  Lee states that, for DSL's eighteen initial contracts with Lida Pipe, all contract negotiations were conducted in English between Lee and Lida Pipe's president, Bill Hu.  Lee further states that the issue of arbitration never came up in his negotiations with Lida Pipe.  Lee Decl., at 2, ¶¶ 4-5.  The initial contracts were prepared by DSL, were exclusively in English, and did not contain arbitration provisions.  *Id*. at 2, ¶ 6.

---

[5]     Ultimately, DSL entered into secondary contracts for ten of the eighteen sales contracts.  *See* Declaration of Sang ("Andy") S. Lee (attached to Doc. # 20) ("Lee Declaration"), at 4, ¶ 12, and Exhs. 7-16.  For another five of the eighteen sales contracts, no secondary agreement was executed but, at Lida Pipe's request, DSL nevertheless remitted payment to Exceed.  *Id*. at 3, ¶ 11, and Exhs. 4-6; *id*. at 5, ¶ 15, and Exhs. 17-18.  For the remaining three sales contracts, the parties entered into secondary agreements that were prepared by DSL rather than by Exceed.  *Id*. at 3, ¶ 10, at Exhs. 1-3.

[6]     *See* Sales Contract No. DSL-120106-LD, dated Jan. 16, 2012; Sales Contract No. DSL-120107-LD, dated Jan. 16, 2012; Sales Contract No. DSL-120214-LD, dated Mar. 12, 2012; Sales Contract No. DSL-120215-LD, dated Mar. 12, 2012 (all attached as Exhibit A to Doc. # 1) (collectively, the "Secondary Contracts").  These Secondary Contracts also are included in Exhibits 12B, 13B, 14B, and 15B to the Lee Declaration.

Lee avers that, at an unspecified time, but apparently before any of the eighteen initial contracts were performed, he received a request from Hu, communicated in English through DSL's purchasing agent Hansol Metal, for DSL to enter into secondary agreements with Exceed, Lida Pipe's sister company.  Hu explained that the secondary agreements would provide that DSL remit payment for the purchased pipe to Exceed's bank account in China.  Lee states, "It was explained to me that this request was made in order for Lida Pipe to avoid taxes on its profits in Vietnam.  I understood that the terms of our Original Contracts would remain . . . and that the . . . supplemental agreements would serve only to direct payment to Exceed."  *Id*. at 2-3, ¶¶ 7-8.  Lee further emphasized that all negotiations and discussions regarding the Secondary Contracts were conducted exclusively in English, that the issue of arbitration was never raised, and that he would have objected if it had been raised.  *Id*. at 3, ¶ 9.

The Secondary Contracts contained several provisions that differed from the original contracts, including an arbitration provision in Paragraph 14.  In each of the four Secondary Contracts, the English version of Paragraph 14 stated as follows:

> Arbitration:  All disputes arising in connection with this Sales Contract or the execution thereof shall be settled by way of amicable negotiation.  In case no settlement can be reached, the case at issue shall then be submitted for arbitration to the China International Economic and Trade Arbitration Commission in accordance with the provisions of the said Commission.  The award by the said Commission shall be deemed as final and binding upon both parties.

Secondary Contracts, at 3, ¶ 14.  Before signing the Secondary Contracts on behalf of

DSL, Lee struck through the English versions of the arbitration provision.  Lee

explained in his Declaration that DSL did not agree to arbitrate, and that he "would

never have agreed to arbitration, especially not in China—a country with which DSL

has no affiliation and whose language I do not speak or understand."  *Id*. at 4, ¶ 13.[7]

Lee, however, did not strike through the Chinese version of Paragraph 14.

　　　　Exceed contends in this action that, because the Chinese version of Paragraph

14 remained in the written agreements, DSL is bound by the agreement to arbitrate.

DSL counters that Lee's strike-through of the English version of Paragraph 14

evidences a clear intent that DSL not be bound by the arbitration provision.

　　　　Lee states that he received no objection from either Lida Pipe or Exceed to his

modifications, and that the parties began performing pursuant to the modified terms.

*Id*. at 5, ¶ 16.  Exceed states that, after it had partially filled the orders, DSL demanded

a substantial discount on the price in the contracts in June 2012, when the market price

of pipe declined in Houston.   When Exceed refused, Exceed alleges DSL canceled

its orders and therefore breached the Secondary Contracts.

---

[7]　　　*See id*. at 5, ¶ 18 ("I do not speak, read, write, or understand Chinese.  DSL has no
office, no operations, no suppliers, or any other contacts in China.  DSL has
absolutely no affiliation with China.").   Lee points out that one of the contracts
between Exceed and DSL, which contract is not at issue here, contained a "choice of
language provision" that Lee struck through "because DSL did not agree that the
English and Chinese language provisions were of equal force."  *Id*. at 4, ¶ 14, and
Exh. 16B.

On September 25, 2012, Exceed initiated arbitration proceedings before the China International Economic and Trade Arbitration Commission ("CIETAC"), an arbitral body that sits in China, in accordance with the Chinese language version of Paragraph 14 in the Secondary Contracts.  The CIETAC panel set a hearing for January 22, 2013. Exceed provides evidence that notices of the hearing, as well as Exceed's application and other preliminary matters, were sent to and received by DSL. Application to Confirm [Doc. # 1], at 3-4.  DSL did not respond to any of CIETAC's communications and did not appear for the hearing.  At the hearing, Exceed presented its case and supplemental evidence, which Exceed states was subsequently provided to DSL.  On April 16, 2013, the panel issued an award in favor of Exceed, determining that DSL had breached the four contracts at issue, and awarding $683,851.95 in compensatory damages, as well as related fees and costs. Arbitral Award of CIETAC, dated Apr. 16, 2013, English version (Exh. D to Doc. # 1) ("Award"), at 12.  DSL neither communicated with nor appeared before CIETAC or the arbitral panel concerning this dispute with Exceed.

On September 3, 2013, Exceed filed an Application to Confirm Arbitration Award [Doc. # 1] in this Court, seeking entry of an order confirming the panel's Award of April 16, 2013.

## II.   EXCEED'S APPLICATION TO CONFIRM ARBITRATION AWARD

### A.   The New York Convention and Article V Defenses to Confirmation

The parties agree that the Award in this case is governed by the United Nations'
Convention on the Recognition and Enforcement of Foreign Arbitral Awards of 1958
(the "New York Convention" or the "Convention").[8]   The New York Convention is
enforced in United States courts pursuant to its implementing legislation, Chapter 2
of the Federal Arbitration Act ("FAA").   9 U.S.C. § 201 (the New York Convention
"shall be enforced in United States courts in accordance with this chapter"); *see
Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi
Negara*, 364 F.3d 274, 288 (5th Cir. 2004).[9]   The statute permits a party to arbitration
to apply to the federal courts for "an order confirming the award as against any other
party to the arbitration," and contains mandatory enforcement language:  "The court
***shall confirm*** the award unless it finds one of the grounds for refusal or deferral of
recognition or enforcement of the award specified in the said Convention." 9 U.S.C.
§ 207 (emphasis added).

The defenses referenced in the statute are listed in Article V of the

---

[8]   United Nations' Convention on the Recognition and Enforcement of Foreign Arbitral
Awards of 1958, June 10, 1958, 21 U.S.T. 2517.  *See* 9 U.S.C. § 202.

[9]   Exceed invokes this Court's jurisdiction under 9 U.S.C. § 203, which provides, "An
action or proceeding falling under the Convention shall be deemed to arise under the
laws and treaties of the United States. The district courts of the United States. . . shall
have original jurisdiction over such an action or proceeding, regardless of the amount
in controversy."

Convention.[10]   Courts in the United States have held consistently that the Convention's Article V defenses are enumerated and narrowly construed, so as to encourage enforcement of arbitral awards in international commercial contracts. *Gulf Petro Trading Co., Inc. v. Nigerian Nat'l Petroleum Corp.*, 512 F.3d 742, 747 (5th Cir. 2008); *Karaha Bodas*, 364 F.3d at 288. *See China Minmetals Materials Import and Export Co, Ltd. v. Chi Mei Corp.*, 334 F.3d 274, 283 (3d Cir. 2003) ("Consistently with the policy favoring enforcement of foreign arbitration awards, courts strictly have limited defenses to enforcement to the defenses set forth in Article V of the Convention, and generally have construed these exceptions narrowly").

In this case, Exceed argues that the mandatory language of Section 207 requires confirmation of the Award.  DSL asserts that the parties never entered into a valid agreement to arbitrate their dispute, and invokes multiple defenses, including several under Article V of the New York Convention.[11]

---

[10]   Under Article V of the New York Convention, "[r]ecognition and enforcement of the award may be refused" by "competent authority in the country where recognition and enforcement is sought" if one of seven enumerated defenses apply.  These defenses include lack of adequate notice regarding arbitration, improper composition of the arbitral authority, and the public policy of the country in which enforcement is sought.

[11]   DSL pleads the following affirmative defenses:  (1) no agreement to arbitrate existed between the parties; (2) CIETAC did not have authority to decide whether an arbitration agreement existed;  (3) Exceed obtained the arbitration award by fraud or undue means; (4) Article V.2(a) of the New York Convention applies because the subject matter of the dispute is not capable of settlement by arbitration under US law; (5) Article V.2(b) of the Convention applies because recognition and enforcement of the alleged award would be contrary to public policy of the United States; (6) Article

(continued...)

The Court holds that, under Article V, confirmation of the Award in this case should be refused.   This conclusion requires several analytical steps.   As discussed below, the Court concludes that: Article V(2) of the Convention includes a defense against confirmation when the parties did not enter into a valid agreement to arbitrate, *see infra* Section II.B; this Court, and not CIETAC, is empowered to decide whether the parties' agreement to arbitrate is valid, *see infra* Section II.C; and, the parties did not reach agreement to arbitrate, *see infra* Section II.D.

## B.    Whether the Absence of a Valid Agreement to Arbitrate Is a Defense Under Article V of the New York Convention

DSL argues that the parties did not enter into a contract to arbitrate their dispute.  This issue is discussed in Section D, *infra*.  A threshold question is whether absence of a valid agreement to arbitrate would establish a viable defense under the Convention.  For the reasons stated below, the Court is persuaded that the absence of a valid agreement to arbitrate is a defense under Article V(2).[12]

---

11      (...continued)
        V.1.a) of the Convention applies because the alleged agreement to arbitrate is not valid;  (7) Article V.1(b) of the Convention applies because DSL was not given proper notice regarding the appointment of the arbitrator or arbitration proceedings; (8) Article V.1(c) of the Convention applies because the Award contains decisions on matters beyond the scope of alleged submission to arbitration;  (9) the Secondary Contracts' arbitration clause is unconscionable because it requires a U.S. company with no contacts in China to arbitrate in China regarding a contract with an entity from New Zealand.  *See* Doc. # 9, at 5-7.   The Court does not reach most of these defenses.

12      Article V(2) of the Convention provides: "Recognition and enforcement of an arbitral
                                                                                        (continued...)

As stated above, the Convention's Article V defenses are enumerated and narrowly construed. *Gulf Petro*, 512 F.3d at 747; *Karaha Bodas*, 364 F.3d at 288. Exceed argues that none of the Article V seven defenses encompass DSL's argument that the parties did not have a valid agreement to arbitrate. Although the Fifth Circuit has not squarely addressed this precise issue, rulings from other circuits are on point and instructive.

In *Sarhank Group v. Oracle Corp.*, 404 F.3d 657 (2d Cir. 2005), the Second Circuit Court of Appeals applied the Article V(2) defense when deciding whether a nonsignatory to an arbitration agreement could be bound by the arbitration award. Oracle Corporation, a Delaware corporation, was not a signatory to an arbitration agreement between Oracle Systems, Inc., a subsidiary of Oracle Corporation, and Sarhank Group. When a dispute arose between Oracle Systems and Sarhank, they arbitrated their dispute in Egypt pursuant to their agreement, and Oracle Corporation objected to the arbitration demand served upon it, arguing that it was not a party to the arbitration agreement and had never consented to arbitration. *Id.* at 658. The arbitration panel in Egypt nevertheless issued an award against Oracle Corporation,

---

<div style="border-top:1px solid #000; width:30%"></div>

[12]     (...continued)
         award may also be refused if the competent authority in the country where recognition and enforcement is sought finds that: (a) The subject matter of the difference is not capable of settlement by arbitration under the law of that country; or (b) The recognition or enforcement of the award would be contrary to the public policy of that country."  New York Convention, 21 U.S.T. 2517.

which was upheld by Egyptian courts.  When Sarhank petitioned in the Southern District of New York to confirm the award, the district court enforced the award against Oracle Corporation.  The Second Circuit remanded for a finding of fact as to whether Oracle Corporation had consented to arbitration.  The Court of Appeals relied upon Article V(2), which provides that United States courts are not required to enforce arbitration agreements when the "subject matter of the difference is not capable of settlement by arbitration" under United States law, *see* Article V(2)(a), or when enforcement "would be contrary to the public policy" of the United States.  *See* Article V(2)(b).  The Court then looked to federal arbitration law and noted that under general principles of contract law, a finding of an agreement to arbitration requires  the parties' consent, or "an objective intention to agree to arbitrate."  *Id*. at 662.  *See also Europcar Italia, S.p.A. v. Maiellano Tours, Inc.*, 156 F.3d 310, 315  (2d Cir. 1998) (noting in *dicta* that a claim that the arbitration agreement itself was forged or fraudulently obtained "might" implicate public policy concerns).

The Third Circuit also has held that the absence of a valid agreement to arbitrate is a defense permitted under Article V.  In *China Minmetals*, 334 F.3d 274, parties from the United States and China arbitrated a commercial dispute before CIETAC. One party, Chi Mei, appeared at arbitration but objected to CIETAC's jurisdiction, arguing that the contract containing the arbitration clause had been forged.  The arbitrator issued an award in favor of China Minmetals, and the district court in New

11

Jersey granted China Minmetals' motion to enforce the award.  The Third Circuit

vacated and remanded.  Although the Court of Appeals acknowledged that "the

absence of a written agreement is not articulated specifically as a ground for refusal

to enforce an award under Article V," *id.* at 283, it then recognized the principle that

an agreement to arbitrate is pivotal.[13]  The Third Circuit held that "[r]ead as a whole

. . . the Convention contemplates that a court should enforce only valid agreements to

arbitrate and only awards based on those agreements."  *Id.* at 286.[14]

More recently, in 2013, the Second Circuit Court of Appeals considered a

question of whether the parties' arbitration agreement evidenced an agreement to

arbitrate questions of arbitrability.  *VRG Linhas Aereas S.A. v. MatlinPatterson*

*Gloabl Opportunities Partners II, L.P.*, 717 F.3d 322 (2d Cir. 2013).   The Second

Circuit noted that, if on remand the district court found that the party opposing

---

[13]     *Id.* at 283-84 ("On the other hand, the crucial principles common to all of these
decisions—that arbitration is a matter of contact and that a party can be forced to
arbitrate only those issues it specifically agrees to submit to arbitration—suggest that
the district court here had an obligation to determine independently the existence of
an agreement to arbitrate even though an arbitration panel in a foreign state already
had rendered an award . . .").

[14]     The Court noted that, under Article 2 of the Convention and applicable federal case
law, if China Minmetals had initiated federal court proceedings to compel
international arbitration, "the court would have been obligated to consider Chi Mei's
allegations that the arbitration clause was void because the underlying contract was
forged.  *Id.* at 281 (citing federal authority that "liberal federal policy favoring
arbitration agreements is at bottom a policy guaranteeing the enforcement of private
contractual arrangements," and that "because arbitration is a matter of contract, no
arbitration may be compelled in the absence of an agreement to arbitrate") (internal
citations, quotation marks, and alterations omitted).

arbitration had not agreed to arbitrate, then such a finding "would compel the denial of [the] petition to confirm the award on the grounds that [the party opposing arbitration] never consented to submit disputes—whether about arbitrability or anything else—to arbitration." *Id*. at 327.  In its analysis, the Court of Appeals cited Article V(2)(a) of the Convention, which provides as a defense that confirmation may be refused if the "subject matter of the difference is not capable of settlement by arbitration" under the law of the country where confirmation is sought.  *Id*. at 325.

This Court agrees with and adopts the reasoning of the above-cited authorities that the absence of a valid agreement to arbitrate is a defense under Article V(2).

### C.    The Court, Not the Arbitral Body, Decides Whether Parties Formed an Agreement to Arbitrate

Having decided that Article V includes a defense for absence of a valid agreement to arbitrate, the next question is what forum should decide whether there is an agreement to arbitrate.  Exceed argues that this Court should defer to the CIETAC panel's enforcement of the Secondary Contract's arbitration provision. DSL argues persuasively that it is this Court that must decide whether the parties reached an agreement to arbitrate.

In the context of domestic arbitrations governed by the FAA, the decision whether the parties agreed to arbitrate their dispute is generally made by the courts, rather than by the arbitrators.  In *First Options of Chicago, Inc. v. Kaplan*, the

Supreme Court held that the question of arbitrability is generally one for the courts to

decide:

> Courts should not assume that the parties agreed to arbitrate arbitrability
> unless there is clear and unmistakable evidence that they did so. . . .
> [G]iven the principle that a party can be forced to arbitrate only those
> issues it specifically has agreed to submit to arbitration, one can
> understand why courts might hesitate to interpret silence or ambiguity on
> the "who should decide arbitrability" point as giving the arbitrators that
> power, for doing so might too often force unwilling parties to arbitrate
> a matter they reasonably would have thought a judge, not an arbitrator,
> would decide.

*First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944-945 (1995) (internal

alterations, quotation marks, and citations omitted).[15]  More recently, the Fifth Circuit

similarly held that "whether a claim is subject to arbitration is a question for a court."

*Crawford Prof'l Drugs, Inc. v. CVS Caremark Corp.*, 12-60922, 2014 WL 1343608,

at *7 (5th Cir. Apr. 4, 2014).  *See Will-Drill Res., Inc. v. Samson Res. Co.*, 352 F.3d

211, 218 (5th Cir. 2003) ("Where the very existence of any agreement is disputed, it

is for the courts to decide at the outset whether an agreement was reached.").  This

holding is founded on the basic principle that, because arbitration is a matter of

contract, a party can only be forced to arbitrate those disputes that the party has agreed

---

[15]   *See Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) ("The question
whether the parties have submitted a particular dispute to arbitration, *i.e.,* the *question
of arbitrability,* is an issue for judicial determination unless the parties clearly and
unmistakably provide otherwise.") (internal quotation marks and citations omitted)
(emphasis original); *DK Joint Venture 1 v. Weyland*, 649 F.3d 310, 316 (5th Cir.
2011).

to submit to arbitration.  *Howsam*, 537 U.S. at 83; *First Options*, 514 U.S. at 945; *Will-Drill*, 352 F.3d at 218.

In the context of confirmation of an international arbitration award under the New York Convention, the same principles apply.  In *China Minmetals*, the Third Circuit squarely considered the issue of whether *First Options* provides the rule of decision in a Convention case and, after carefully reviewing norms of international arbitration, concluded that the *First Options* holding was applicable.

> [I]nternational law overwhelmingly favors some form of judicial review of an arbitral tribunal's decision that it has jurisdiction over a dispute, at least where the challenging party claims that the contract on which the tribunal rested its jurisdiction was invalid. . . .  Although *First Options* arose under the FAA, the Court's reasoning in the case is based on the principle that "arbitration is simply a matter of contract between the parties . . ."  This rationale is not specific to the FAA. It is a crucial principle of arbitration generally, including in the international context. Indeed, even international laws and rules of arbitration that traditionally grant arbitrators more leeway to decide their own jurisdiction have allowed a party objecting to the validity of the agreement to arbitrate to seek judicial review of an arbitral panel's decision that it has jurisdiction under the alleged agreement.

*China Minmetals*, 334 F.3d at 289 (citation omitted).[16]  In *China Minmetals*, as in the

_____

[16]     *See Todd v. Steamship Mut. Underwriting Ass'n (Bermuda) Ltd.*, 601 F.3d 329, 334-35 (5th Cir. 2010)  ("It is true that the Convention and the FAA differ in certain important respects.  However, in both FAA and Convention cases, courts have largely relied on the same common law contract and agency principles to determine whether nonsignatories must arbitrate, and *not* law derived from statute or treaty.  Consequently, . . . cases discussing whether nonsignatories can be compelled to arbitrate under the FAA are relevant for this case governed by the New York Convention.") (footnotes omitted)

case at bar, the arbitration provision at issue incorporated the rules of CIETAC, which rules allow the arbitrators to determine their own jurisdiction.  The Third Circuit noted, however, that "incorporation of this rule into the contract is relevant only if the parties actually agreed to its incorporation.  After all, a contract cannot give an arbitral body any power, much less the power to determine its own jurisdiction, if the parties never entered into it."  *Id.* at 288.  The Second and Eleventh Circuits have reached the same conclusion.[17]

This Court similarly concludes that it is not bound by the CIETAC arbitration panel's enforcement of the Secondary Contracts' arbitration provision.  Therefore, this Court proceeds to the question of whether the parties in fact agreed to arbitrate their dispute.

### D.    Whether the Parties Agreed to Arbitrate

*First Options* and the FAA provide the rule of decision for cases brought under the Convention, unless there is a conflict between Chapter 1 of the FAA, which is applicable to domestic actions, and Chapter 2, which is applicable to actions under the

---

[17]    In *VRG Linhas*, 717 F.3d at 327, the Second Circuit instructed the district court, on remand, to address the question of whether the parties actually reached an agreement to arbitrate.  The Eleventh Circuit, in a case where one party contended that it had not agreed to submit its dispute to arbitration, held that the district court was not bound by the arbitration panel's finding of arbitrability in a New York Convention case, and thus the district court should decide the question of arbitrability.  *See Czarina, L.L.C. v. W.F. Poe Syndicate*, 358 F.3d 1286, 1293 (11th Cir. 2004).

Convention.[18]  The Supreme Court has held that, when deciding whether the parties entered into an agreement to arbitrate, "courts generally . . .  should apply ordinary state-law principles that govern the formation of contracts."  *First Options*, 514 U.S. at 944.   The Fifth Circuit repeatedly has applied this principle.  *See Lizalde v. Vista Quality Markets*, 13-50015, 2014 WL 1226730, at *2 (5th Cir. Mar. 25, 2014) ("To determine whether an agreement to arbitrate is contractually valid, courts apply 'ordinary state-law principles that govern the formation of contracts.'") (quoting *Morrison v. Amway Corp.,* 517 F.3d 248, 254 (5th Cir. 2008)); *Will-Drill*, 352 F.3d at 218 (courts apply general state law principles of contract formation); *Vallejo v. Garda CL Sw., Inc.*, 948 F. Supp. 2d 720, 726 (S.D. Tex. 2013) (Rosenthal, J.) (Texas law governs question of contract formation), *aff'd,* 13-20344, 2014 WL 1329290 (5th Cir. Apr. 4, 2014).  *Accord In re Palm Harbor Homes, Inc.*, 195 S.W.3d 672, 676 (Tex. 2006) (citing *First Options*, 541 U.S. at 944).

This basic principle also applies to proceedings under the New York Convention involving international arbitration awards.  The Second Circuit recently held that, when determining on remand whether a party to an international contract agreed to arbitration, the district court should apply ordinary principles of contract formation, "including the consideration of extrinsic evidence to resolve ambiguities

---

[18]    9 U.S.C. § 208.  *See Todd*, 601 F.3d at 334-35; *id*. at 334 n. 10 (collecting cases); *China Minmetals*, 334 F.3d at 280-81.

in contractual language." *See VRG Linhas*, 717 F.3d at 327.  Similarly, in *Sarhank*,

the Second Circuit held, "[a]n agreement to arbitrate must be voluntarily made, and

the Court decides, based on general principles of **domestic** contract law, whether the

parties agreed to submit the issue of arbitrability to the arbitrators." *Sarhank*, 404 F.3d

at 661 (emphasis added) (citing *First Options*, 514 U.S. at 943).

       This Court therefore applies Texas law to the question of contract formation.

Under Texas law, arbitration is a matter of contract and is founded on the parties'

consent.[19]  "The answer to most questions regarding arbitration flow inexorably from

the fact that arbitration is simply a matter of contract between the parties."  *Perry*

*Homes*, 258 S.W.3d at 593  (internal citation and quotation marks omitted).  Because

arbitration is a matter of contract law, "courts may require a party to submit a dispute

to arbitration only if the party has expressly agreed to do so."  *Texas Petrochemicals*

*LP v. ISP Water Mgmt Servs. LLC*, 301 S.W.3d 879, 883 (Tex. App.–Beaumont,

2009).  Therefore, although Texas courts recognize the FAA's presumption in favor

---

[19]    *See Perry Homes v. Cull*, 258 S.W.3d 580, 584 (Tex. 2008) ("Since 1846, Texas law has provided that parties to a dispute may choose to arbitrate rather than litigate"); Tex. Civ. Prac. & Rem. Code § 171.021 (under Texas General Arbitration Act, a court shall order arbitration upon a showing that the parties entered an agreement to arbitrate, and shall deny an application to compel arbitration upon a showing that no such agreement existed); *id*. § 171.023 (court may stay arbitration upon showing that there is no agreement to arbitrate); *Speedemissions, Inc. v. Bear Gate, L.P.*, 404 S.W.3d 34, 42 (Tex. App.–Hou. [1st Dist.] Apr. 4, 2013) ("Arbitration is a creature of contract, and parties seeking to compel arbitration must rely upon an agreement to arbitrate") (citing, *inter alia*, *In re Merril Lynch Trust Co. FSB*, 235 S.W.3d 185, 192 (Tex. 2007)).

of arbitration,[20] this presumption does not apply when the courts decide the preliminary issue of whether the parties contracted to arbitrate their dispute.  Rather, "'the presumption arises only after the party seeking to compel arbitration proves that a valid arbitration agreement exists.'"  *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 737-38 (Tex. 2005) (quoting *J.M. Davidson, Inc. v. Webster,* 128 S.W.3d 223, 227 (Tex. 2003)).  The existence of a valid arbitration agreement "is a gateway matter for the court to decide."  *In re Rubiola*, 334 S.W.3d 220, 224 (Tex. 2011) (citing *In re Weekley Homes, L.P.,* 180 S.W.3d 127, 130 (Tex.2005); *Sherer v. Green Tree Servicing LLC,* 548 F.3d 379, 381 (5th Cir. 2008)).[21]

---

[20]    Under the FAA, arbitration is favored when the parties have agreed to arbitrate their disputes.  *See Preston v. Ferrer*, 552 U.S. 346, 349-50 (2008) (because the FAA requires application of "federal substantive law regarding arbitration" in both state and federal courts, the FAA supersedes state laws that lodge primary jurisdiction in a non-arbitration forum when the parties have agreed to arbitrate all questions arising under a contract) (citing *Southland Corp. v. Keating*, 456 U.S. 1, 16 (1984)); *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24-25 (1983) (Section 2 of the FAA "create[s] a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act," and "questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration"); *Bhatia v. Johnston*, 818 F.2d 418, 421 (5th Cir. 1987) (when deciding whether the parties agreed to arbitrate their dispute, the court must look to the "body of federal arbitration law" that resolves doubts regarding the scope of the parties' agreement in favor of arbitration).

[21]    *Accord  AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1745 (2011) (it is a "'fundamental principle that arbitration is a matter of contract,'") (quoting *Rent–A–Center, West, Inc. v. Jackson,* 130 S. Ct. 2772, 2776 (2010)); *id.* at 1749 (the "overriding goal" of the FAA is to "ensure judicial enforcement of privately made agreements to arbitrate") (internal quotation marks and citation omitted); *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 681, 683 (2010)  (arbitration is a matter of "consent, not coercion," and the parties to an arbitration agreement are free
(continued...)

The dispositive factual question before the Court, therefore, is whether the parties agreed to arbitrate. Under Texas law, the party urging arbitration must show that the arbitration agreement meets all requisite contract elements for a valid and binding contract. *IHS Acquisition No. 131, Inc. v. Iturralde*, 387 S.W.3d 785, 791 (Tex. App.–El Paso, 2012) (citing *Davidson,* 128 S.W.3d at 228).[22] Formation of a binding contract requires: "(1) an offer; (2) acceptance in strict compliance with the terms of the offer; (3) a meeting of the minds; (4) each party's consent to the term; and (5) execution and delivery of the contract with the intent that it be mutual and binding." *IHS*, 387 S.W.3d at 791 (citing *Cessna Aircraft Co. v. Aircraft Network, L.L.C.,* 213 S.W.3d 455, 465 (Tex. App.-Dallas 2006, pet. denied)).

The parties advance competing positions regarding the enforceability of the arbitration provision at issue. Exceed argues that the Chinese version of Paragraph 14 in the Secondary Contracts is sufficient to demonstrate DSL's agreement to arbitrate. Texas law provides that a party to a contract—especially a sophisticated party to an international business contract—cannot sign a contract and then later try

---

[21]    (...continued)
        to structure their agreement as they see fit) (internal quotation marks and citations omitted); *Will-Drill*, 362 F.3d at 214.

[22]    *See Davidson*, 128 S.W.3d at 227 ("A party attempting to compel arbitration must first establish that the dispute in question falls within the scope of a valid arbitration agreement. . . . . If the trial court finds a valid agreement, the burden shifts to the party opposing arbitration to raise an affirmative defense to enforcing arbitration").

to escape its provisions by claiming not to have understood it.[23]  As Exceed points out,

Lee could have stricken through the corresponding Chinese language provision as

well.[24]  DSL counters that Lee's strike-through of the English arbitration provision

before signing and the fact of negotiations solely in the English language clearly

expressed DSL's intent not to be bound by the provision.  Notably, Exceed supplies

no evidence to contradict the Lee Declaration.

The Court holds as a matter of law that the Secondary Contracts are

---

[23]   *See, e.g.*, *Am. Heritage Life Ins. Co. v. Lang*, 321 F.3d 533, 538 (5th Cir. 2003)
(parties generally are bound by contractual provisions they sign, even if a party cannot
understand the contract due to blindness, illiteracy, or inability to understand the
language in which the contract is written); *Duran v. Intex Aviation Servs., Inc.*, 98
F.3d 1339, at *2 (5th Cir. 1996) ("Texas courts have consistently held that individuals
are charged with knowing and understanding the contents of what they sign.").

[24]   Exceed also asserts that DSL's strike-out of the English provision is of no
consequence because the United Nations Conventions on Contracts for the
International Sale of Goods ("CISG") applies to this dispute and provides that
Chinese and English have equal force.  Doc. # 1, at 3 n.1.  Exceed's argument is
unavailing.  The cited CISG provision merely provides that its own text is equally
authentic in six official languages.  *See* U.S. Ratification of 1980 United Nations
Convention on Contracts for the International Sale of Goods: Official English Text,
52 FR 6262-02, at *6279 (Mar. 2, 1987) (closing language states, "DONE at Vienna,
Austria, this eleventh day of April, one thousand nine hundred and eighty, in a single
copy in the Arabic, Chinese, English, French, Russian and Spanish languages, each
text being equally authentic.").

Exceed also cites to the arbitrators' Award, at 4, which holds that the English and
Chinese provisions in the Secondary Contracts had equal force.  The Court rejects this
circular argument.  When the Court is deciding whether the parties had a valid
agreement to arbitrate, the Award is not binding on the Court.

unambiguous in that they do not contain valid arbitration provisions.[25]   This

conclusion is based on the contract as a whole and the circumstances present when the

contract was formed.[26]   The parties' intent to arbitrate is an essential inquiry for this

Court.  *Perry Homes*, 258 S.W.3d at 606;  *see Stolt-Nielsen*, 559 U.S. at 681-82.

Lee's strike-through of the English version of the arbitration provision establishes

without evidentiary contradiction that he did not intend to be bound by such a

provision.  *See Houston Exploration*, 352 S.W.3d at 470-71 ("deletions in a printed

form agreement are indicative of the parties' intent") (citing *Gibson v. Turner*, 294

S.W.2d 781, 782 (1956); *Houston Pipe Line Co. v. Dwyer*, 374 S.W.2d 662, 663 (Tex.

1964); 11 RICHARD A. LORD, WILLISTON ON CONTRACTS, § 32.13 (4th ed. 1999)).

---

[25]   Under Texas law, a contract is ambiguous if it is "subject to two or more reasonable interpretations after applying the pertinent rules of construction," but is not ambiguous if "it can be given a definite or certain meaning as a matter of law." *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996).

[26]   A court must decide as a matter of law whether a contract is ambiguous "by examining the contract as a whole ***in light of the circumstances present when the contract was entered***." *Id.* (emphasis added).  *See Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 741 (Tex. 1998); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995); *Sun Oil Co. (Delaware) v. Madeley*, 626 S.W.2d 726, 731 (Tex. 1981).  Parol evidence, by which the parties seek to contradict or change the agreement's written terms by oral statements, is not admissible.  *Sun Oil*, 626 S.W.2d at 731-32.  However, the parol evidence rule "does not prohibit consideration of surrounding circumstances that inform, rather than vary from or contradict, the contract text."  *Houston Exploration Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 469 (Tex. 2011).  *See CGL Underwriters v. Edison Chouest Offshore, Inc.*, 8 F.3d 21, at *4 (5th Cir. 1993); *E.E.O.C. v. Safeway Stores, Inc.*, 714 F.2d 567, 576 n. 18 (5th Cir. 1983); *Pennzoil Co. v. F.E.R.C.*, 645 F.2d 360, 388 (5th Cir. 1981).

Furthermore, all the evidence of record regarding the circumstances surrounding the formation of the Secondary Contracts favor DSL's interpretation that the parties did *not* agree to arbitrate their dispute.  As recounted in the Background section of this opinion, the Secondary Contracts at issue are supplemental to the original contracts between DSL and Lida Pipe.  The original contracts were in English only, and contained no arbitration clauses.  Lee Decl., at 2, ¶6. The Secondary Contracts containing the arbitration clauses at issue were drafted by Exceed and supplied to DSL for the internal business purposes of Lida Pipe and Exceed.[27]  All negotiations and discussions regarding these Secondary Contracts were exclusively in English. *Id*. at 3, ¶ 9.  Exceed never raised or discussed the issue of arbitration. *Id*. Lee states, "I would never have agreed to arbitration, especially not in China—a country with which DSL has no affiliation and whose language I do not speak or understand."  *Id*. at 4, ¶ 13.  After Lee struck through the arbitration provision, he signed the Secondary Contracts and returned them as modified.  The parties thereafter began performance of the agreements.      In sum, the Court finds that DSL did not agree to arbitrate disputes under the Secondary Contracts.  Under these circumstances, the Chinese language arbitration clauses are not enforceable and the Secondary

---

[27]     Lee states that Lida Pipe and Exceed requested the Secondary Contracts in order to direct payment to Exceed in China, and therefore to permit Lida Pipe to avoid taxes in Vietnam on its profits.  Lee Decl., at 2-3, ¶ 7.  Exceed and Lida Pipe have not proffered any opposing facts.

Contracts do not require DSL to arbitrate its disputes with Exceed.[28]

### E.    Conclusion

The Court finds that the parties did not enter into an agreement to arbitrate their dispute, and concludes that DSL has established a defense to confirmation under Article V(2) of the New York Convention.[29]   Exceed therefore is not entitled to confirmation of the Award issued by CIETAC.  The Court does not reach the other defenses to confirmation raised by DSL.

## III.   MOTIONS TO DISMISS DSL'S COUNTERCLAIMS

Exceed and Lida Pipe both have moved to dismiss DSL's counterclaims.  *See* Docs. # 15, # 17.  These parties argue that DSL's counterclaims should be dismissed because they are procedurally improper, invoking Rules 12(b)(1), 12(b)(6), and 12(f) of the Federal Rules of Civil Procedure.  Exceed did not file an original "complaint" because actions to confirm international arbitration awards are not civil actions.  Rather, they are summary proceedings in the nature of federal motion practice.  *See*

---

[28]     DSL initially did not ask for this merits ruling, requesting instead that decision on Exceed's Application to Confirm Arbitration Award be stayed pending discovery into Exceed's intent and other matters.  However, DSL's requested discovery is not necessary for decision of the issues before the Court.  Both Exceed and DSL have briefed the issue of whether an agreement to arbitrate exists and have requested a ruling on that issue.  *See* Doc. # 28, at 4-7; Doc. # 34 , at 9-14-15.

[29]     The Court is unpersuaded by Exceed's arguments regarding waiver based on DSL's non-appearance at the CIETAC proceeding.  Given the Court's holding above that the agreement to arbitrate was not valid, DSL's failure to appear before CIETAC cannot constitute waiver.

*Imperial Ethiopian Gov't v. Baruch-Foster Corp.*, 535 F.2d 334, 335 & n. 2 (5th Cir. 1976); 9 U.S.C. § 6 (made applicable by 9 U.S.C. § 208).  DSL nevertheless filed an "Answer" and counterclaims.  *See* Doc. # 9.[30]

Counterclaims are not properly imposed in a confirmation proceeding under the New York Convention.  *See Ottley v. Schwartzberg,* 819 F.2d 373, 377 (2d Cir. 1987) ("Actions to confirm arbitration awards . . . are straightforward proceedings in which no other claims are to be adjudicated"); *Marker Volkl (Int'l) GmbH v. Epic Sports Int'l, Inc.*, 965 F. Supp. 2d 308, 310-11 (S.D.N.Y. 2013); *Evergreen Sys., Inc. v. Geotech Lizenz AG*, 697 F. Supp. 1254, 1257 (E.D.N.Y. 1988); *Fertilizer Corp. of India v. IDI Mgmt., Inc.*, 517 F. Supp. 948, 963 (S.D. Ohio 1981).  *See also Waterside Ocean Navigation Co., Inc. v. Int'l Navigation Ltd.*, 737 F.2d 150, 153 (2d Cir. 1984). The Convention allows for a summary disposition of the issues and does not contain a provision permitting counterclaims in confirmation proceedings.  This summary proceeding of limited scope serves "the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expansive litigation."  *Scandinavian Reinsurance Co. Ltd. v. Saint Paul Fire & Marine Ins. Co*., 668 F.3d 60, 71-72 (2d Cir. 2012) (internal quotation marks and citation omitted).  *See Marker Volkl*, 965 F.

---

[30]     DSL brings two counterclaims for breach of contract (one pertaining to shipment deadlines and one to quality specifications) and a claim for attorneys' fees.  DSL also seeks declaratory judgment that no agreement to arbitrate exists, which issue is now resolved by the holding above, making this claim moot.

Supp. 2d at 310; *Evergreen*, 697 F. Supp. at 1257. Therefore, DSL's counterclaims will be **dismissed without prejudice**.

## IV.   <u>MOTION FOR STAY</u>

DSL filed a Motion to Stay Arbitration Confirmation Pending Discovery [Doc. # 16], which requests that DSL be granted permission to conduct discovery "as to its defenses to confirmation" of the Award.  For the reasons stated above, DSL's Motion to Stay will be **denied as moot**.

## V.   <u>CONCLUSION</u>

For the foregoing reasons, it is hereby

**ORDERED** that Exceed's Application to Confirm Arbitration Award [Doc. # 1] is **DENIED**.  It is further

**ORDERED** that Exceed's Motion to Dismiss DSL Corporation's Counterclaims [Doc. # 15] is **GRANTED**.  DSL's counterclaims against Exceed are **DISMISSED without prejudice.**  It is further

**ORDERED** that Lida Pipe's Motion to Dismiss DSL's Third Party Complaint [Doc. # 17] is **GRANTED**.  DSL's counterclaims against Lida Pipe are **DISMISSED without prejudice**.  It is finally

**ORDERED** that DSL's Motion to Stay Arbitration Confirmation Pending Discovery [Doc. # 16] is **DENIED as moot**.

A separate final judgment will issue.

SIGNED at Houston, Texas, this **30**th day of **April, 2014**.

Nancy F. Atlas
United States District Judge